Case number 152272, Felipe Garcia-Cruz v. Loretta Lynch Good morning, your honors. Randy Olin III, Mr. Garcia-Cruz. May I reserve one minute, please? Mr. Garcia-Cruz entered politics in June of 2011 by joining the Patriot Party in an effort to unseat the sitting mayor of his hometown. He joined the executive committee and functioned as an advancement for campaign events, a very visible position. When the sitting mayor won re-election, the Patriot Party claimed fraud and demonstrations that occurred right after the election. The municipal building was burned down. Mr. Garcia-Cruz was wrongly blamed for taking part in that. He ultimately received one death threat in person from UNIDA members and five subsequent death threats by phone. He ultimately fled to the United States and applied for asylum, withholding of removal, and relief under the Convention Against Torture. The agency denied his applications on three basic grounds, that he had not suffered past persecution, that he did not establish a law for future persecution, and that he could relocate internally. The starting point of the review, your honors, is the credibility fraud in the court. The agency found Mr. Garcia-Cruz to be credible. Its sole basis for claiming that the threats did not constitute past persecution was in saying that they were not so menacing as to cause actual harm. It's axiomatic that death threats alone can rise to the level of persecution, and one need not wait for the harm to occur, to manifest itself, before they reach that level. What we look for is, are the threats credible, specific, do they threaten imminent harm, and are they isolated? If you look at the actual threats that he received, the most important point is that they're obviously credible, because they were corroborated by what the UNE party was doing to his colleagues in the Patriot Party. At the same time that Mr. Garcia-Cruz was being threatened with death, the UNE party members were beating, kidnapping, and killing his colleagues within the Patriot Party. This alone, I believe, distinguishes the case from those couple of cases that the government has cited where the threats did not rise to the level of persecution. In addition, if you look at the threats themselves, they were obviously credible, based on the corroboration, they were specific, they threatened imminent harm, and more than that, they were systematic. They first began with a general threat, that if you vote against the mayor, we're going to kill you. But then they became more specific and systematic toward Mr. Garcia-Cruz. First they blamed him for the arson, we're going to kill you if you don't pay for it. Then when he was afraid to go outside, they followed up with threats, why aren't you coming outside, why are you in hiding? Then when he moved halfway across the country because of the threats, the next threats were, we know where you are, and we're going to come and get you, and if you don't come back, we're going to kidnap your wife and your children. So these threats were not only corroborated by the violence against his other party members, but viewed the way we normally analyze these, they're clearly credible threats, and they rise to the level of persecution. When you say against other party members, we're talking about a political party that was large enough in the country to prevail in the presidential elections. At the time, that's correct. You mean the Patriot Party? Yes. His party? Yes. And so how many deaths were there in the entire country among Patriot Party members? I think the figure, I don't have it right at the tip of my tongue, but the figure is in our briefing, and they're numbered somewhere around 70-something, I think, I'd have to double-check the figure. But it was a sizable number of people who were killed by the United Party, who, by the way, has a presence throughout Guatemala. Was that the argument the government makes, that he can move elsewhere and be safe? That is a fundamentally important question here, Your Honor, because the issue of internal relocation can decide the case against him. In a matter of MCMR, the Board of Immigration Appeals created a framework for analyzing the question of internal relocation. They first have to decide, the first step is, can he safely relocate? And if he can safely relocate, you have to look at various factors to determine whether it's sensible for him to do so. Let me ask you, I can look it up, but maybe you know, compared to Massachusetts, how big is Guatemala? It's the size of Virginia. The size of Virginia? Yes. And forget what the population is. It may be close to Rhode Island's population, if I'm not mistaken, Your Honor. But it's a small country. It's not a big country. When you address this question of internal relocation, Your Honor, the regulation itself says that once you determine that he could relocate safely, which the agency never even considered. They never even got to step one, but hold on to the further considerations. You have to consider whether the person would face serious harm in the place of suggested relocation. As I've said, UMEI operates all over the country, and of course he would face harm. They found him when he moved halfway across the country. Any ongoing civil strife within the country, you can take administrative notice or judicial notice that Guatemala is rife with political violence, especially electoral violence. Administrative, economic, or judicial infrastructure. I think we all know what the judicial infrastructure is in Guatemala. Geographical limitations. Social and cultural constraints. He's K'iche'. He speaks K'iche'. That limits him right off the bat to an indigenous part of the country where he could be safe. The agency did not consider one of these factors. Now, what the government said in response to that fact is, well, he had the burden because we found that he did not suffer past persecution. He had the burden to raise this issue. Well, he did raise the issue. He testified and the evidence he presented was that it was a small country, would not be safe anywhere, that UMEI has a national presence throughout the country, that he was a highly physical political operative, that they knew who he was and where he was, that it was not economically feasible for him to relocate, and the inability of the federal government to protect him. All of that evidence he put forward at that point. I mean, the government also points to the relocation of his wife and child. And even though she was not similarly situated to the extent that she wasn't a political participant, according to the record, she was the subject of threats to him. And they noted that she has not, there's nothing in the record to suggest not only that she hasn't been harmed, but that she's received any threats. Well, we are aware of the case law that says that that's of little significance if she does not have the same trait as the person who's being persecuted. The threat to kidnap her was not a threat against her. It was a threat against him. And that is a qualitative difference. The threat was not against her. She had nothing to do with politics. They would not have been seeking her out to punish her for her political activity. The threat was against him and his political activity. If I can briefly say, Your Honor, just to sum up on that issue, this case would have to be remanded solely for the board to conduct a proper evaluation pursuant to their own regulations with respect to this very important question of internal relocation. Finally, Your Honor, the determination that he did not have a well-founded fear. I'm sorry. So you're not saying that on this record that the record compels reversal. You're saying that the request you're seeking is a remand for purposes of taking additional. I think this is a very voluminous record. There's a lot of country conditions report documentation in this record. I think this court can make that determination. But at the very least, it would have to go back on remand for reconsideration. But I do believe this court could make that determination. With respect to the denial of the well-founded fear of persecution, despite his credible testimony that he would be harmed, that he had a well-founded fear, the agency found that for reasons which are nonsensical and are non-sequitur. For example, the agency said that he had only been a political operative for a few months. Well, he was a political operative long enough for them to know he is in receiving death threats. It's not how long you are a member of the party. It's what you do and what you face. They also said that because the president was of the Patriot Party, that that would somehow make him safer.  The country conditions reports are replete with evidence that the federal government is virtually united with respect to taking care of local concerns. With that, I'll reserve my minute. Thank you. Thank you. Ms. Murphy, good morning. Good morning, Your Honors. May it please the Court, Lindsay Murphy on behalf of the Attorney General. Your Honor, substantial evidence here supports the agency's decision to deny Mr. Garcia's applications for asylum and withholding of removal. Mr. Garcia. I have a question here. The I.J. found him to be credible. Yes, Your Honor. And he had at least five credible death threats. Were they credible? According to the I.J.? The petitioner's testimony was found to be credible. And he testified about the death threats. However, the death threats that the petitioner received, the immigration judge and the board agreed, were deemed to be not sufficiently specific. They were not imminent. They did not threaten a serious imminent risk of harm. And I think that was the distinction that the agency made in concluding that these death threats, standing alone, were insufficient to establish past persecution. So you've got to say, I'm going to kill you tomorrow? Well, in line with this Court's case law, Your Honor, death threats standing alone generally are insufficient to establish past persecution. There has to be some other risk of harm or indication that harm is immediate, whether it be a death threat made in person while the persecutor is brandishing a weapon, whether it be members of the petitioner's family suffering harm as a result of similar types of threats. Here, the petitioner didn't offer anything. What about his colleagues that were getting beat up and killed? Well, that's an interesting question, Your Honor. The documentary evidence of record, while it does show that the pre-election violence included threats by both party members to the other parties, nothing in the record shows that in Mr. Garcia's municipality post-election that any violence was committed by the UNEG, the Ghana party. Weren't they going after the people they claimed that had burned the building down? They had indicted a list of people who were supposedly responsible for the burning of the municipal building. Those people were part of Mr. Garcia's party. Mr. Garcia's name was not on the list. Wasn't he on the board of directors or something similar to that local party? Yes, Your Honor. That made him fairly well-known to the other side. Well, he was on an executive committee, you're correct, Your Honor, with about 70 other people. He had joined in, I think, two or three months before in the lead-up to the election. And the number of people who were on this list that are published in the news articles of the record, I think, are about eight or nine people, none of whom those names do not include Mr. Garcia's. They do not include anybody that he knew. And Mr. Garcia himself testified that he didn't know what became of his fellow committee members after leaving Guatemala. And so it's not clear from the record that the people that he served with on the committee were threatened, that they were beaten at the very time that he was receiving the threats. Moving on to Mr. Garcia's ability to internally relocate, the agency properly found that this was established. Mr. Garcia had moved, I think, about around the end of September, early October, to a city or a municipality several hours away. While he did receive a few threats there by phone, he was able to take the ship out of his phone. He didn't receive any more death threats. Well, he didn't have a shipment, and that's probably why he didn't get them. But they didn't know that he was elsewhere, even though he had relocated. Yes, Your Honor. And they knew enough to be able to call him. They knew enough to be able to call him, and they also claimed to have known enough to find where he was or that they knew where he was. Yet even after he took the ship out of his phone and they were no longer able to access him by phone, they didn't make any other attempts to try to track him down or find him or his family. And I think this all cuts against Mr. Garcia's claim that he would not be able to relocate internally. Regarding the other factors. If I get the chronology right, after he moved, it was in January that the last call, he was there for another five months, out and around, working, living. They knew where he was, and not a single thing happened. That's correct, Your Honor. And there's no evidence anything happened to any one of the people who were higher up in the organization from his town? Not that it's been presented in the record, Your Honor. And furthermore, I think during this time, the petitioner had received a threat that his wife was in danger, and so he was able to move his wife out of the town to another town nine or ten hours away where she was able to find work. And so I think the fact that both of them were able to find work, go out in public in these different locations, and they were not harmed, supports the agency's decision that they were not only able to relocate, but it was reasonable to expect them to do so. How long ago was it she received the threat? I believe she received the threat around the same time, so somewhere between September of 2011 and January of 2012. And she's been there since then? As far as I know, Your Honor, I think petitioner's counsel noted in his brief that the wife and child may now be in the United States, although I'm not sure that's not supported by the record. And if the court has no further questions? Do you know if she's here, do you know if she has an asylum petition? We just don't know. I don't know, Your Honor. I don't know any of her identifying information. Okay, we just request that the court deny the petition for review. Thank you. Thank you. I'm sorry, just one more thing. Sure. Counsel is requesting a remand on the issue of relocation, saying that the agency didn't comply with its own standards of review in making that determination. I think a remand here would be entirely unnecessary. While the agency may not have explicitly gone through each of the factors of reasonableness laid out in the board's decision MZMR, those factors clearly were considered implicitly. The fact that the petitioner was able to relocate to a new town, that he was able to find work in that new town, despite supposedly speaking a different dialect, he was able to proceed normally. And the same goes for his wife. So I think those factors were all very important in the agency's internal relocation determination, which really supports the reason for finding no well-founded fear of future persecution. Thank you. Okay. Thank you, Your Honors. Just a couple of points, Your Honor. My sister said that something about the threats not being, would be different if they were delivered by someone carrying guns. Well, the first threat was delivered in person by UNE Ghana members carrying guns and machetes. So with respect to that threat, there it is. How do we weigh the fact that they knew where he was, he was out and around, we're talking about, what, four months in his prior, his original town, five months in his other, and there wasn't a single incident at all, a bump, someone chasing him, just nothing over that period of time. My response to that is he was fortunate that he got out of that country before something did happen. But doesn't that long duration with absolutely no follow-up at all, nor anything happening to any of his colleagues during that period of time, doesn't that provide substantial evidence for a determination under an administrative procedure that he was not, in fact, facing them? First of all, I don't believe it's accurate that his colleagues were not being harmed during the last half of the election. I think that's obvious in the record. Secondly, it's a factor. What you're suggesting is a factor in the analysis. What the government is saying and saying here today is they want to short-circuit the ZMR analysis and they want to focus on a couple of the factors that maybe work for them, but they want to ignore all the other factors in the analysis that argue against internal relocation. The question of internal relocation cannot be answered without considering the issue by the standards and the regulations that the board has set themselves. Finally, if I can just say that the failure to find the past persecution obviously infected the case because he did not receive the benefit of the presumption that he would suffer future persecution. Thank you, Your Honor. Thank you.